DADE, J.
delivered the opinion of the Court:
This is a petition .for a.. Writ of Error to a judgment of the Superior Court of Hen-rico, by which the petitioner was condemned to the' punishment of stripes, and sale and transportation, beyond, the limits of the United States, under the'Act of 21st February, 1823, entitled ‘ ‘An Act, to amend the Penal Laws of this Commonwealth.” The petitioner suggests three errors in that judgment:
“1. Because the Indictment lays the date of the offence on the 4th December, one thousand eight hundred and twenty ‘thee,’ which, supposing the ‘thee’ to be mere surplusage, and therefore to be expunged, is a date on which, if the offence were committed, it is not punishable by any existing Law.
“2. That the Law passed on the 23d February, 1823, under which the petitioner was tried and sentenced, and which, for the commission of the crimes therein alluded to, condemns a free negro or mulatto to be sold as a slave, and transported beyond the limits of the United States, is unconstitutional, and therefore void.
‘ ‘3. That the offence of grand larceny, of which the petitioner was found guilty, is not such a crime as by. the above Law is punishable with stripes, sales and transportation, but is legally punishable with imprisonment in the Penitentiary, for a period not less than one, nor more than three years.”
*The Court has bestowed on these questions, all the consideration which the importance of two of them at least demands. For the first supposed error, they consider it cured by the Criminal Statute of Jeofails. It is impossible to wink so hard as not to see clearly, that the word “thee” following the word “twenty,” was designed for “three,” and that upon the trial, it must have been so understood by the prisoner, the jury, and the Court. If indeed, it had only been necessary for the jury to have rendered a general verdict of ‘ ‘ guilty, ’ ’ there might have been more plausibility in this supposed defect. But, when in their verdict they have affixed to the crime a punishment not applicable to it in 1820, but established by an Act of 1823, we cannot doubt as to their understanding of the word “thee,” nor consider any defect more properly amendable by the before mentioned Statute of Jeofails.
Upon the second alleged error, the Court are clearly of opinion, that there is nothing in the Constitution or Bill of Rights, repugnant to the power which the Legislature has exercised in the punishment of this crime. Notwithstanding the general terms used in the Bill of Rights, it is undeniable that it never was contemplated, or considered, to extend to the whole population of the State. Can it be doubted, that it not only was not intended to apply to our slave population, but that the free blacks and mulattoes were also not comprehended in it? The leading and most prominent feature in that paper, is the equality of civil rights and liberty. And yet, nobody has ever questioned the power of the Legislature, to deny to free blacks and mulattoes, one of the first privileges of a citizen ; that of voting at elections, although they might in every particular, except color, be in precisely the same condition as those qualified to vote. The numerous restrictions imposed on this class of people in our Statute Book, many of which are inconsistent with the letter and spirit of the Constitution, both of this State and of the United States, as respects the free whites, demonstrate, that, *307 here, those instruments have not been considered to extend equally to both classes of our population. We will only instance the restriction upon the migration of free blacks into this State, and upon their right to bear arms.
As to the ninth section of the Bill of Rights, denouncing cruel and unusual punishments, we have no notion that it has any bearing on this case. That provision was never *designed to control the Legislative right to determine ad libitum upon the adequacy of punishment, but is merely applicable to the modes of punishment. We had existed for a considerable time as a community, regulated by Laws guarded by Penal sanctions, when this Bill of Rights was declared. We consider these sanctions as sufficiently rigorous, and we knew that the best heads and hearts of the land of our ancestors, had long and loudly declaimed against the wanton cruelty of many of the punishments practised in other countries : and this section in the Bill of Rights, was framed effectually to exclude these, so that no future Legislature, in a moment perhaps of great and general excitement, should be tempted to disgrace our Code by the introduction of any of those odious modes of punishment.
In the decision of these points, the Court is unanimous. The third error assigned, is one of greater difficulty, and upon which, there is some difference of opinion amongst the Judges. A majoritj', however, is of opinion, that there is no error in this respect, in the judgment of the Superior Court. Affixing to the word ‘punishable,” in the first and third sections of the Act of 21st February, 1823, intituled “An Act, further to amend the Penal Laws of this Commonwealth,” its ordinary acceptation of “liable tobe punished,” or that “may be punished,” and rejecting the last proviso in the first section, as insensible or repugnant, there is no room for construction upon this Act. We will endeavour to present this view of the two sections in its simplest form: and therefore, as it has never been questioned that the first section extended the punishment of stripes as well to free blacks and mulattoes, as to whites, we will present a reading of these sections, excluding the whites from the first section, and comprehending only the free negroes and mulattoes, so as to make the two sections perfectly correlative. Then it might with strict propriety be read thus: 1st sec. “Henceforth, when any free negro or mulatto, shall be convicted of any crime or offence, now punishable by imprisonment in the Public Jail and Penitentiary-house, for any period not exceeding two years, such person shall be punished with stripes, &c.” (3d sec.) “And if such free negro or mulatto, shall be convicted of any offence, now by Law punishable by imprisonment in the Public Jail and Penitentiary-house, for more than” (or “for a period exceeding”) “two years, he shall be punished *by stripes, sale and transportation, &c. ” (a) Although in this reading of the Act, the two sections are blended, and the very words of the Legislature are not always used, yet it will not be disputed, but that it presents a faithful view of the two sections, as respects the free people of colour atone. And when the words “not exceeding,” in the first clause, and the word “more” or “exceeding” in the second, are brought into palpable opposition, we have no manner of difficulty in understanding the Act, and so we have no room for construction. We can find no language to make this plainer, and therefore, we proceed at once to the application of the Law to the crime of grand larceny. We find that grand larceny' is punishable,' (that is, may be punished) by confinement in the Jail and Penitentiary-house,' for three years, and that it is not a whit the less thus punishable, or in' other" words, does not the less appropriately come under the definition of an offence punishable for three years, because it may also in certain degrees, be punished for one year only. Therefore, grand larceny is an offence punishable, (or Which may be punished) for more than two years, or for a period exceeding two years, and so is within the last clause of the blended sections, and third section of the Act.
But it is insisted, that this Act cannot be executed without subjecting it to construction, and two reasons are assigned for this opinion. 1. That the word “punishable” is so indefinite, as to convey to the mind no distinct impression of the crimes, or classes of crimes, to be arranged under the two sections. 2. That the second pro^ viso in the first section, distinctly indicates it to have been the Legislative purpose to include in the first section the punishment of crimes, the maximum of whose punishment did exceed two years. And the construction which is thus introduced, terminates in reversing the order which we think the Legislature has pursued, and in establishing the term of two years in thé first section as the minimum punishment of those offences, to be punished by stripes, and confinement in the county jail, and in like manner, in the third section^ 'excluding from the punishment of sale and transportation, all offences, the minimum punishment of which did not exceed two years confinement in the Penitentiary. *We should have great hesitation in adopting a construction which would lead to this conclusion, because it involves the necessity of imputing to the Legislature the use of words, in a sense diametrically opposite to the meaning they are calculated to convey. Tims, if two years be adopted as the minimum in 'the first section, a number of offences, such as man-slaughter, malicious stabbing, &c. &c. which may be punished by confinement in the Penitentiary for ten years, would be subjected to whipping, and confinement in the county jail: and so the Legislature, *308 in affixing this punishment to offences, in their own language, “not exceeding” in their punishment two years confinement, would be made to have extended the new punishment to cases stretching under the then - existing' Laws, to ten years 1 So, where in the third section they subject the free negro to sale and transportation, for any offence theretofore punishable by confinement in the Penitentiary for “more than” two years, they would be understood to exclude a considerable number of crimes, which were then punishable by ten years confinement in the Penitentiary! Surely a construction which leads to these consequences, introduces more perplexity, uncertainty, and confusion, than it excludes; and when we consider, that by construing the word “punishable,” according to its ordinary acceptation, all is plain and consistent, we cannot hold ourselves warranted in giving it a more artificial meaning, with all the above consequences, merely for the purpose of obviating what may be regarded as a severe and rigorous punishment. And even with this view, it should not be overlooked, that unless we fall into the inconsistency of construing that word differently in the two sections, we shall, by the same process of reasoning, by which in favorem lib.ertatis we construe it to exclude free blacks from a punishment deemed severe, and disproportionate to some of the crimes to which this opinion subjects them, subject free whites, under the first section, to the punishment of public whipping, for a great number of crimes, amongst which are some, such as'man-slaughter and stabbing, to which it seems very inapplicable : A punishment, too, of the whites, at which public sentiment not less strongly revolts; than at the sale and transportation of the free blacks. We cannot, therefore, yield our assent to the construction which is deduced from the supposed uncertainty of the word “punishable.”
*A more serious difficulty would ensue from the second proviso of the first section, if it were not so wholly repugnant to the enacting clauses of the same section, as to justify the Court upon well-settled principles in rejecting it.(b) We have before exposed some of the difficulties which stand in the way of giving such a construction to the first section, as to make it comprehend crimes, the minimum punishment of which did not exceed two years imprisonment, a construction which must be adopted to make this proviso in any wise sensible. But such a construction, with all its consequences, no one has yet professed himself entirely prepared to adopt. Independent of the objections to the great extension of a revolting punishment, there are many crimes, the punishment of which lies in imprisonment for a period between five and ten years, and between one and two and ten years, betwixt which this construction would raise the most unaccountable discriminations. For example, man-slaughter would be punished with stripes, and horse-stealing with confinement in the Penitentiary : stabbing would be punished with stripes, and burglary with imprisonment in the Penitentiary. Moreover, there is a long list of crimes, comprising, indeed, a majority of all those capitally punished, which were punished in the highest degree with the same term of confinement in the Penitentiary, and thus appear to have been considered by the Legislature as capable of mounting up to an equal degree of malignity. Yet the construction of this Act, urged bj the petitioner’s Counsel, wholly disjoins them in their punishment, subjecting certain of these equally malignant crimes to stripes, and confinement in the county jail, and others of them to imprisonment, as heretofore, in the Penitentiary, and that, too, without any reasonable standard of discrimination.
Upon the whole, we regard this proviso as insensible and repugnant to the enacting clause of the Statute, and therefore to be rejected. And this, as before suggested, frees the Court of the necessitjr of resorting to the construction of the Statute. But if it were' necessary to subject it to such a test," whatever difficulties might arise on the first section as 'regards the punishment of the whites, we can at least see very clearly that our construction would effect one ^leading object of the Legislature, with respect to the free blacks. It is always competent to a Court, in the construction of a Statute, to look to the evil intended to be remedied: and this purpose may be gathered either from its general notoriety, or from its recital in a preamble. Now, it is notorious that the Legislature regarded as a great evil the confinement of free negroes and mulattoes in the Penitential; and that, when engaged upon the Law under our consideration, their total exclusion from thence, was one of their objects. This, object, the construction now established, carries into effect.
The petition for a Writ of Error is overruled.
R. E. Parker, J.,
.pronounced the following opinion.
On the principal question arising in this Case, I concur in the opinion which has just been delivered by Judge Bouldin.* The Act of February, 1823, has been twice before, brought to the notice of the Judges, but at neither time, under circumstances eliciting that severe scrutiny, which it has received at the present Term. The first time, it was éxamined in conference, with a view to settle an uniform construction of its enactments; but without reference to any particular Case. The second time, was in the Case of Attoo, who had been convicted of an offence committed previous to the commencement of the Act, and who prayed to be discharged from the conse *309 quences of that conviction. The motion for a Writ of Error was scarcely resisted by the Attorney General, upon" an intimation that the Judges had, on the former occasion, considered the question, and it was granted, pretty much as a matter of course. Since then, we have, all of us, on our Circuits, and I amongst the rest, acted on these impressions in a variet3’’ of Cases, until it requires some effort to free ourselves (I speak at least as to myself) from the influence of these pre-conceived opinions, and to examine the question as a new one. But at this time, Cases are brought before us, evincing the rigor of the Taw, and demanding the strictest investigation ; one of them has been argued by the Counsel for the convict, as well as the Attorney General. We have freely and fully conferred on the subject, with (what I think an '^important circumstance) an e3re to these Cases, and the • whole has resulted in a perfect conviction to my mind, that we have been wrong ab ovo in the construction of this Taw, and that we ought now to retrace our steps. This opinion I should pronounce with confidence, but for the contrary opinions of so large a majority of my brethren, which admonish me to distrust my own, however maturely formed or carefully examined.
The grounds upon which I go, and the reasons which conduct me to this conclusion, have been, most of them, just explained in a manner perfectly satisfactory to me, and in entire accordance with my own views. In the little I have to add, I will endeavour not to repeat what has been said so much better by another, but to place the subject in one or two other lights somewhat different from the one in which it has been presented.
It must be obvious to the most superficial reader of the Act of February, 1823, that it was drawn very carelessly and inartificially. Terms are used, the most vague and indefinite that ever were applied to highly penal enactments. Offences, instead of being enumerated with precision, are grouped together by a loose reference to their former punishments. A proviso is tacked to the first section apparently at war with the enacting clause, and certainly at variance with itself, by bringing together, through an obvious mistake, several offences, the minimum punishment whereof was one 3ear, with another offence, the minimum punishment whereof was five years; and to crown the whole, by referring to a Taw, by another obvious mistake, not in existence; to wit: the Act of February, 1812, instead of the Act of February, 1819. With such evidences of the intention, or rather of the want of intention, of the draughtsman of this Act; shall we be very scrupulous in adhering to the letter of the Taw, when its general scope and meaning is visible, in spite of the obscurities of the medium through which we view it?
If any thing may be affirmed with cer-taint3^ concerning it, it is this, that the Teg--islature intended to include within its first section, all offences whose minimum punishment was less than two years, and thought that they had expressed that intention in intelligible language. This is rendered certain, by the proviso, whose office it is to restrain the generality of the enacting clause, and to exclude cases otherwise falling within it. The legislature believing that *this enacting clause embraced all offences where the punishment by the Penitentiary Taw mig-ht be less than two years imprisonment, notwithstanding it might also be more, conceived themselves bound to provide specially for certain felonies, punishable for from one to ten years, which they desire to exclude from its operation, and therefore inserted the proviso. This frees their general intention from the possibility of a doubt or cavil, and that ought to be regarded as the thread to guide us through this lab3,rinth. If the general intent is obvious, we ought not to stick to particular words, of loose or doubtful meaning, to control it, unless on the side of a mild and mitigated construction ; certainly not in favour of a punishment, which, when applied to the lowest class of offences, is excessively harsh and t3rannical.
Having, as they thought, provided in the first section for offences which might be punished with two 37ears imprisonment, or less, they next proceeded by a ver3r natural process, to provide, in the case of free ne-groes and mulattoes, for offences then by law punishable with a longer term: having regard in both cases, to the minimum punishment, and contrasting the words not exceeding two years, and more than two years; which term of two years they seem to have regarded as a proper dividing point between the classes.
Adopting this construction, we shall be relieved from all embarrassments; we shall, in a great measure, free the Act from the charge of gross inhumanity ; we shall carry the intention of the Tegislature into effect, as evidenced by the proviso; we shall distinguish the higher and lower offences by a line running much nearer the ancient land marks of our Criminal Code, than if we adopt any other construction; and we shall be doing this in favour of the prisoner; in favour of liberty, and not against it.
Why shall we not adopt it? 1. It is said that the words of the first section will not admit this construction, and that the proviso must be rejected as senseless and unmeaning. I admit, that if the words of the first section are so fixed and definite in their signification, as to convey but one idea, we must adhere to that, and even reject the proviso; although if the proviso seems to imply an extension of a benefit to the prisoner, (as of clergy, or any mitigated punishment,) I might be carrying my admission too far. But they are not so fixed and definite. They are used in *a very loose and vague sense, and will allow of various 'readings. The proviso, then, is essential in assisting us to the true one, and cannot be rejected or *310 disregarded in a Penal Statute, where every word is entitled to weight; the words are, “when any person shall be convicted of any crime or offence now punishable by imprisonment in the Public Jail and Penitentiary-house, for any period not exceeding two years, such person,” &c.
If the term punishable means, as it generally does, capable of punishment, this clause 'might have reference, either to a maximum or minimum punishment, without doing violence to its words; for, grand larceny, to illustrate the idea by an instance, is capable of being punished by a term not exceeding two years, as well as by a term exceeding it. It is capable of being punished by one year’s imprisonment, and one year does not exceed two years. In which sense shall it be taken? The proviso most clearly shews in what sense it was used, by declaring that the enacting clause shall not extend to certain offences within one and ten years, and therefore in that sense it shall be taken, unless it deprives the prisoner of some benefit, or increases his punishment. If it did, the humanity of the Taw' will protect him against doubtful and uncertain expressions, although the general intent be obvious. But the rule is never' reversed, and made to operate against the accused. So, in the third section, the words are, “Henceforth, when any free negro or mulatto shall be convicted of an offence now by Taw punishable by imprisonment in the Jail and Penitentiary-house for more than two years, such person,” &c. Take the case of grand larceny again. This offence is capable of being punished by imprisonment for more than two years, but it is as certainly capable of being punished by imprisonment for less. The Taw cannot mean both. Why, then, include such offence within it? If it extended to the prisoner some benefit, if it mitigated the rigor of some punishment, revolting to our feelings, and in opposition to public sentiment, we ought to do so, because doubt, either of Taw or fact, should incline us to the side of mercy. But, if it has an effect directly the reverse, why adopt the harsher construction, in opposition, too, to the clear general intent of. the Tegislature, as manifested in the first section? The two sections were made uno flatu, with one will and design, and must be construed in reference to each other.
*But again, it is said, that to give this construction to the first section, would bring within its operation several of-fences committed by white men, for which, punishment by imprisonment in the county jail, and stripes, would be a severe and inappropriate punishment: and the cases of man-slaughter, and stabbing on a sudden quarrel, are mentioned. I would observe here, that the offences which would thus be included, are generally of a minor character, and such as the benefit of clergy was formerly extended to; and I have no doubt fhat' the Tegislature imagined they were awarding to them a less severe punishment than they received under the Penitentiary system, and one more analogous to burning in the hand. Por this reason, I would give this first section a liberal construction in favour of the accused, and I cannot believe that the supposed severity, or inappropriateness, of the punishment, is a well-founded objection, or any test of the sense of the Tegislature. This punishment is confessedly appropriate to some of the smallest offences. Therefore, it was not considered so severe as Penitentiary confinement. There is also vested in the Courts, so great a power of discrimination, both as to the imprisonment, and the stripes, and particularly as to the latter, that, according to this construction, it may be made to fit every Case coming within the range of the first section, except the offences particularly enumerated in the proviso. If stripes is in any case an inappropriate punishment, they may perhaps be dispensed with altogether ; for, there seems to be nothing limiting the discretion of the Court, and they may certainly be made a mere nominal punishment.
Another objection to this interpretation of the Taw, is this: That, by it, we admit certain offences to be within the highly penal clauses of the third section, as for example, negro-stealing, whose highest range of punishment was eight years imprisonment in the Penitentiary, and yet we would exclude other offences, as the felonious breaking into a store or ware-house, which might heretofore be punished with as many as ten years imprisonment. To this I answer, that by an examination of our Taws, it will be found in general, that the minimum term of punishment fixes the grade of the offence, and that if we resort to the maximum, as a criterion, we shall encounter insuperable difficulties. To give one instance of several: Man-slaughter may be punished by as much as ten years imprisonment; *murder in the second degree, by as little as five years; yet murder in the second degree, upon all possible circumstances, is a higher crime than man-slaughter. This proves that the Tegislature have paid very little attention to the maximum punishment, thinking, no doubt, that the humanity of the jury would apply the corrective, and it is therefore unsafe to permit that circumstance to have much weight with us. In point of fact, we shall find that the cases included in the third section, by this construction, are all of the highest grade in the scale of guilr; and those excluded, of a milder character; some of them, indeed, of such a character, as to render it very improbable the Tegislature could have intended to punish them by the loss of liberty, and deportation beyond the limits of the United States.
Upon the whole, therefore, I am prepared to over-rule our former decisions, as to both sections of this Taw. But if any rigid principle of construction, if any adherence to the letter of the Taw, if any supposed severity, or inapplicability of punishment, hinders us from doing this in relation to *311 the first section, let us not, in a doubtful case, where the terms used are so general and obscure, the intention of the legislature, to say the least of it, not clearly expressed, against the prisoner, and the punishment so harsh and uncongenial to the spirit of our people, and their institutions ; let us not, I say, extend this third section any further than we are absolutely compelled to do, by the principles of the Common Haw, applied to the construction of Penal Statutes. My brother Bouldin, I think, has clearly shewn that we shall do no violence to these principles, if we take this course, but the contrary; and, referring to his argument on this point, as well as on several others I have purposely omitted, I conclude by reiterating my decided conviction that the Writ of Error applied for in this Case, ought to be awarded for the third reason assigned in the petition.

 See the Act itself in Shelton’s Case, Ante, p. 384.

 6 Bac. Abr. 381, and the authorities there cited.

 The Reporter has not been furnished with the opinion of Judge Boijldin.